UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
JAIME FELDMAN-BOLAND AND JAMES BOLAND,

                Plaintiffs,

                                                     **JURY TRIAL**
                                                     **DEMANDED**

    -against-                                             **COMPLAINT**

MORGAN STANLEY, MORGAN STANLEY & CO. LLC,
and DAVID TURETZKY,

                Defendants.
---------------------------------------------------------------x

      Jaime Feldman-Boland ("Feldman") and James Boland ("Boland") (collectively "Plaintiffs"), by their attorneys, Reavis Parent Lehrer LLP, hereby brings this Complaint against Morgan Stanley ("Morgan Stanley"), Morgan Stanley & Co. LLC formerly known as Morgan Stanley Smith Barney LLC ("MSSB") and their former supervisor David Turetzky ("Turetzky") for violations of anti-retaliation provisions of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX"), and the Dodd Frank Act of 2010, 15 U.S.C.A. § 78u-6 ("Dodd-Frank").

## Preliminary Statement

1.    This action arises out of defendants' termination of the employment of plaintiffs Feldman and Boland because of their objections to and complaints about fraudulent activity and violations of the securities laws at the Morgan Stanley branch office at 55 East 52nd Street in New York City. Morgan Stanley and MSSB terminated the employment of plaintiffs for their "whistle-blowing" activities and are therefore liable under SOX and Dodd-Frank. Plaintiffs are entitled to be made whole, including back pay with interest, front pay, statutory damages, front pay, damages for emotional distress, litigation costs, and reasonable attorney's fees.

1

## The Parties

2. Plaintiff Feldman is a thirty eight year old resident of New York, New York. She is married to Plaintiff Boland who also resides in New York. Feldman is a United States citizen and Boland is a permanent resident of the United States.

3. Upon information and belief, Morgan Stanley is a Delaware corporation with its headquarters and principal place of business in New York, New York. Morgan Stanley is a financial services company with 2014 net income exceeding $3.4 billion dollars. Morgan Stanley's shares are traded on the New York Stock Exchange.

4. Upon information and belief, defendant MSSB is a Delaware limited liability company with its headquarters and principal place of business in New York, New York. Upon information and belief, it is a wholly owned subsidiary of Morgan Stanley and its financial results are consolidated with its parent. Morgan Stanley controls the operations of MSSB and is responsible for its employment and compliance functions.

5. Upon information and belief, defendant Turetzky is a resident of the State of New Jersey and was the branch manager of the office where plaintiffs were employed and their direct supervisor during all relevant times herein.

## Jurisdiction and Venue

6. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

A. **Feldman Is Employed by MSSB and Enters into Joint Production Agreements**

8. Feldman joined MSSB at the end of 2008 after four years at Merrill Lynch where she had been a successful financial advisor in the wealth management area. At all relevant times

2

herein Feldman had the Series 6, Series 7, Series 63, Series 66 and Series 31 licenses and was a registered representative with the Financial Services Regulatory Authority ("FINRA").

9. Feldman began working at the MSSB branch office at 330 Madison Avenue under the supervision of Turetzky. As is typical for new employees who are in the process of establishing a book of business, she was party to a joint production agreement ("JPA") with an established Morgan Stanley broker. For high net worth clients, she was party to a JPA with Michael Silverstein ("Silverstein") whereby commissions for all clients that Feldman brought to the firm would be split 50/50 with Silverstein. For clients with lower net worth, Feldman was party to a JPA with a broker named Robert Pachter ("Pachter") and another one with a broker named Frank Loccisano ("Loccisano").

10. Under her agreement with Silverstein, Feldman was to gather client information and arrange initial meetings with prospects while Silverstein was supposed to prepare and present the detailed investment proposals. Feldman was extremely diligent about obtaining information, including client account statements for existing investments, and setting up meetings. In contrast Silverstein basically ignored his obligations to Feldman. He ignored her prospects in favor of his existing clients who were not subject to the JPA and often canceled meetings or failed to prepare the necessary materials. Because of Silverstein's marked lack of interest in helping her develop her business, Feldman's production numbers suffered and she on occasional did not meet the firm's internal production goals.

11. The inequity of the arrangement was demonstrated by the fact that as of January 2011, Feldman had presented to Silverstein more than $100,000,000 in client assets for which Silverstein had failed to prepare any investment proposals.

12. Despite the obstacles put in her way because of Silversteins' apathy, Feldman met her target for assets and revenue in January 2011, due primarily to her work with clients who had

3

less than $1,000,000 and who were not subject to the JPA with Silverstein.

**B.     Boland Joins MSSB**

13.    Boland joined MSSB in December 2010. He had worked with Feldman at Merrill Lynch and the two were engaged. Their relationship was disclosed to Morgan Stanley and to Turetzky at the time of Boland's hire.

14.    At all times relevant herein, Boland was a registered representative with FINRA and held the following licenses: Series 7, Series 66 and Series 31.

15.    Boland was also considered a "trainee" and required to enter into a JPA with an established broker. Although a 50/50 split is typical, Boland was presented with a JPA with a broker named Lisa Santo which required him to remit 60% of revenues and assets he brought in to Santo and her team. Boland objected to the unfair and unusual arrangement. He was also concerned that, as Santo and another member of her team had multiple negative disclosures on their FINRA's broker check website, they would not be suitable to introduce to Boland's high net worth prospects.

16.    Since Boland had to complete MSSB's in-house training program before he could get a production number and generate revenue, he did not have to sign the JPA with Santo immediately. He continued to look for other brokers with whom he could team.

**C.     Boland and Feldman Witness Fraudulent Conduct**

17.    In March 2011, the Morgan Stanley branch where Feldman and Boland worked, moved from 330 Madison Avenue to a smaller location on 55 East 52nd Street. Due to space limitations, brokers were moved from offices or cubicles to a shared trading desk environment. This environment provided little privacy and made overhearing conversations unavoidable.

18.    Boland and Feldman sat on the open floor, next to members of a broker team led by one of the branch's largest producers, Jeremy Burch. Upon information and belief, the Burch team

4

consisted of Burch, Sasson Afshari (trainee), Alan So (intern) and Elena Rubinov (unlicensed client services associate).  Upon information and belief, none of the members of the Burch team, other than Afshari and Burch, were licensed or permitted to execute trades.

19.     Feldman and Boland repeatedly witnessed Burch handing batches of handwritten trade orders to Afshari, Rubinov or So to enter into MSSB's trading system.  Since Rubinov and So were not authorized to execute trades, they must have used Burch's or another broker's access code, which is in and of itself a flagrant violation of firm policy.

20.     Feldman and Boland reasonably believed that allowing unlicensed individuals to execute batches of trades was a violation of applicable securities regulations and potentially fraudulent in that it undermined MSSB's and Morgan Stanley's obligation and representation that they would provide the best execution on a trade.

21.     Feldman and Boland also witnessed Afshari and other trainees cold calling clients, under the supervision of Damon Gallagher, the Branch Business Development Officer who reported to Turetzky.  The trainees used a sales script that was misleading and deceitful.  In particular the script targeted employees of large companies like Pfizer or Verizon who were near retirement and had 401(k) retirement plans held at Fidelity Investments.  The cold callers would urge the employee to transfer their 401(k) to a Morgan Stanley IRA, based on an explicit guarantee of a higher return, the callers expressly stated that the proposed investment would generate an annual return of 15%.  In fact the investments were in closed end mutual funds which were extremely risky and experienced sharp fluctuations in net asset value.  Feldman and Boland reasonably believed that these investments were generally unsuitable for persons close to retirement.

22. After the call, the prospective clients would be sent a return Federal Express envelope, told to complete the enclosed documents and forward the paperwork along with the Fidelity rollover check back to Morgan Stanley.

23. Feldman and Boland reasonably believed that the solicitation of the 401(k) rollovers contained deceptive and misleading guarantees of returns and took no account as to whether a rollover would be suitable for the client. As such Feldman and Boland believed that violated the anti-fraud provisions of the federal securities law, as well as FINRA rules and Morgan Stanley's internal policy. Because the solicitations were done over the phone and through the mail, which crossed state lines, the activities also violated federal wire and mail fraud statutes.

24. Feldman and Boland also learned that once the paperwork had been received from the clients who opened IRA accounts with MSSB as a result of the cold calls, the client's risk profile was changed after the fact in order to allow for investments in the highly risky closed end mutual funds. Feldman and Boland reasonably believed that the after the fact risk designation was fraudulent and deceptive and a violation of the federal securities laws, the wire and mail fraud statutes, FINRA regulations and firm policy.

25. Boland and Feldman also witnessed brokers working from home for substantial periods of time without the supervision required in a normal branch office. They reasonably believed that this was a violation of SEC and FINRA rules.

26. Feldman and Boland decided to log the incidences of improper conduct before approaching Turetzky with their concerns. Rather than relying on an isolated incident, Boland and Feldman wanted to be sure that there was a clear pattern of intent before making any serious accusations.

6

### D. Silverstein Attempts to Claim an Improper Insurance Commission

27. In March 2011, Feldman approached two prospective clients who she had previously introduced to Silverstein about an investment in a whole life insurance policy. As Silverstein was not licensed to sell insurance he instructed Feldman to pursue the insurance opportunity separately with Ron Horowitz (MSSB's Internal Insurance Specialist) and to place the revenue under Feldman's own production number.

28. Subsequently Silverstein learned that the policy was for $10 million and that there would be an approximately $50,000 commission and annual payments of $8,000 annual trail to the broker of record.

29. On or about April 4, 2011, Feldman was ambushed in Silverstein's office just prior to a follow up meeting with the client and was coerced into signing a new JPA with Silverstein and another broker named Robert Rijo who was licensed to sell insurance products. Rijo was an existing partner of Silverstein.

30. Feldman became suspicious of Silverstein's motives for opening a new JPA. She believed that the JPA was an attempt by Silverstein to gain a share of the insurance commissions which he was not authorized to receive.

31. Feldman told Boland that she had been coerced into signing an agreement that she believed was being used to commingle an insurance commission in violation of MSSB Policy and insurance regulations. Subsequently, Boland suggested that it was time to go to Turetzky to report all the wrongdoing that they had witnessed.

### E. Feldman Reports Her Concerns to Turetzky and Suffers Retaliation

32. On or about April 17 Feldman met with Turetzky to complain about Silverstein's improper attempt to gain an insurance commission. When Turetzky showed complete indifference to her concerns, she then raised the other issues that she and Boland had witnessed

7

such as the batching of orders, unlicensed interns and assistants trading in client accounts, misleading cold calling, guaranteeing performance, changing risk profiles and other wrongdoing. Turetzky immediately became agitated and instructed her to get out of his office with words to the effect of "I don't want to hear this."

33. Thereafter, on April 25, 2011, Turetzky requested that Feldman provided him a list of her clients and prospects.

34. Upon information and belief, sometime in early May 2011, weeks after the April meeting, Turetzky went to the Morgan Stanley human resources department to obtain permission to terminate Feldman on the pretext of substandard performance.

35. While he was awaiting approval to terminate Feldman, Turetzky pretended to try to mediate the differences between Feldman and Silverstein. Disingenuously, he instructed Feldman not to contact her prospects, stating "…until an agreement is reached, it is only fair to ask that that you both refrain from contacting any of the prospects in question…" Turetzky was in fact waiting for Human Resources to approve Feldman's termination and was preparing to allow Silverstein take over her business opportunities.

36. One of the most important opportunities involved a proposed $200,000,000 investment in commodities by one of Feldman's major prospects (the "Commodities Client"). She introduced the Commodities Client to MSSB management. Morgan Stanley compliance performed a due diligence and the institutional trading desk started structuring the proposed transaction after a meeting with the Commodities Client at Morgan Stanley's New York office. The proposed series of commodities purchases would have resulted in excess of $40,000,000 in commissions and fees.

37. Feldman learned that Silverstein had told the Morgan Stanley institutional trading desk that he, not Feldman, was the introducing broker, which was patently untrue. Feldman went to the desk to set the record straight.

38. On May 11, 2011 Silverstein, embarrassed at being caught in a lie, verbally assaulted Feldman in his office, using multiple curse words, including what is colloquially known as the "F-Bomb." Silverstein's harang could be heard by the entire floor. Silverstein also threatened Feldman with a choking gesture. Feldman was extremely upset by this verbal assault and physical threat.

39. A few days later, after the initial shock had worn off, Feldman reported the incident to Turetzky at the insistence of Boland. Turetzky later categorized Silverstein's assault as "Mike being a little abrasive".

40. Thereafter, Silverstein with the tacit approval of Turetzky, embarked on creating a hostile work environment for Feldman who was forced to continue to sit just a few feet from Silverstein's office. Often when Silverstein would walk past Feldman's desk he would glare at her. He never apologized to her but inexplicably told Boland that he was "sorry."

41. Turetzky made no attempt to mitigate the situation by moving Feldman to another part of the office even though there was available space.

42. Feldman was so traumatized by the situation she was often unable to properly compose herself in meetings and would become emotional and uncontrollably burst into tears. She continues to suffer nightmares about the incident to this day.

F. **Feldman And Boland Complain to Morgan Stanley Executives And Feldman's $200,000,000 Deal is Cancelled**

43. In early June, Greg Fleming, the President of Morgan Stanley sent a firm wide memo stating that Morgan Stanley would not tolerate harassment or discrimination. Inexplicably,

9

Feldman had not yet been contacted by MSSB's Human Resources department after she complained to Turetzky about Silverstein's May 11, 2011 assault. Therefore, on June 15, 2011, Feldman wrote to Fleming, describing her situation with Silverstein and stating that Turetzky had failed to supervise brokers in the branch.

44. Later that day, Feldman was called into Turetzky's office and informed that the Firm had made a decision not to pursue the initial $200 million commodities deal "…at this time." Given that the transaction had previously been approved by compliance, the rejection of the business was irrational and in Feldman's reasonable belief completely retaliatory.

45. Defendant's sudden and unexplained rejection of the $200,000,000 commodities deals was made in bad faith in order to punish Feldman. Upon information and belief, Morgan Stanley intended to approach the prospect at a later date, presumably after Feldman had been terminated.

46. Sensing that there may have been a cover up of the Silverstein incident as well as failure to report regulatory violations by brokers under Turetzky's supervision, on June 20, 2011, Boland wrote to James Gorman, the CEO and Chairman of Morgan Stanley with whom he was personally acquainted. Not wanting to go into great detail in writing, Boland told Gorman that he had witnessed "discriminatory, unethical and perhaps illegal practices." He warned Gorman that the "actions and inactions of Management at the Branch level may well escalate a very negative, public perception of the Firm" which warranted Gorman's attention.

47. In response to Boland's complaint, Gorman referred the matter to Andy Saperstein, President of Global Wealth Management, stating explicitly that "This is best handled by GWM [Global Wealth Management]. Andy will make sure it gets the right hearing."

48. The next day Boland received an email from Dana Ritzcovan, head of Morgan Stanley Human Resources acknowledging his email to Gorman and informing him that he would be

10

contacted by a member of her staff. In a subsequent telephone conversation with staff member Adena Katz, Boland brought up his concerns about fraudulent conduct at the branch. Instead of making further inquiries, Katz focused on the Silverstein incident. In a later conversation, she then went on the offensive, accusing Boland of hiding his relationship with Feldman, which was patently untrue. Turetzky was aware of their romantic involvement at the time of Boland's hire and their engagement was public knowledge within the branch.

G.     **Feldman and Boland's Efforts to Fulfill Their Production Goals.**

49.    On July 3, 2011 Feldman and Boland were married, but returned to work on July 5, postponing their honeymoon to further pursue Feldman's pipeline of business as well as new opportunities.

50.    Feldman and Boland subsequently met with Christina Nuzzo of the Firms Wealth Advisory Center (WAC). Nuzzo expressed her delight at the quality of Feldman's prospects and a $10 million prospect Boland had recently introduced to the Firm.

H.     **MSSB Offers Feldman a Transfer To Another Branch.**

51.    On July 25, 2011, Feldman was notified MSSB had concluded its investigation of the May 11 altercation with Silverstein and concluded that while Silverstein's conduct was unprofessional, it was not grounds for termination.

52.    MSSB offered Feldman a transfer to another MSSB branch in order to separate her from Silverstein. Feldman and Boland decided to accept this offer in order to alleviate the emotional and mental distress the situation was causing Feldman. Thereafter they made inquiries with another branch manager in the New York area with whom Boland was acquainted to see if there was a vacancy. They were also told that Morgan Stanley was independently looking for possible transfer locations.

53. On or about July 28, 2011, Feldman was summoned into Turetzky's office and accused of using the 'F-Bomb" the evening before. Feldman was threatened with termination even though Silverstein had not been terminated for using the same term and engaging in even more egregious conduct. Boland complained about this double standard to both MSSB human resources and Morgan Stanley senior management, noting that the use of profanity is among brokers and traders is common. In fact Boland and Feldman regularly overheard and documented both male and female employees using the "F-Bomb", even in front of Turetzky. To their knowledge, no-one had ever been reprimanded, let alone called before HR for such a commonplace occurrence.

### I. Feldman and Boland file a complaint with the SEC

54. Having concluded that defendants intended to take no action to correct to investigate or correct the fraudulent behavior, they has witnessed and which Feldman had reported to Turetzky in April 2011 and Boland had reiterated to Gorman and Katz, Feldman and Boland contacted the Securities Exchange Commission to register their complaints.

55. On the evening of July 21, 2011, both Feldman and Boland submitted identical complaints to the SEC Whistleblower website.

56. At the regulators request, Feldman and Boland then met with representatives of FINRA. on August 8, 2011 at FINRA's offices on Wall Street. During this six hour meeting they both gave evidence to a panel of FINRA investigators detailing the activity set forth in their whistleblower filing. Among the matters they discussed were:

- unlicensed assistants and interns making batch trades in client accounts;
- unlicensed interns cold calling prospects using various scripts to solicit 401(k) rollovers, even if the investments were unsuitable;
- misleading guarantees of returns;

- falsifying of client risk profiles to justify the purchase of risky asset classes and alternative investments;

- unlicensed interns using broker credentials to make trades and record client notes;

- unsupervised and unregistered use of home offices.

57. The FINRA regulators instructed Feldman and Boland to continue documenting evidence and to forward any documentation which would assist in their investigation of the branch.

58. At FINRA's request, Boland forwarded some of the cold calling scripts to which he had access to FINRA investigators.

**J.    FINRA Commences an Investigation of The Branch.**

59. On or about the second week of August, 2015, FINRA commenced an investigation of the audit of the 52nd street branch. On one audit questionnaire, FINRA asked about the maintenance of home offices, an issue which Feldman and Boland had raised at their meeting with the regulators. At a branch meeting held on around this time, one of the Branch Risk Officers, William Schwartz, in effect told the brokers to lie about the existence of their home offices and the amount of time they spend working from them especially over the summer.

60. Schwartz stated that firm did not want to pay the fees for registering home offices, nor did the firm want to incur the additional costs in maintaining the regulatory measures required to supervise brokers' activity when trading or conducting client meetings from home.

61. Due to the proximity of Feldman and Boland's desks to the office of Chris Hofmann, a Branch Risk Officer, they would often inadvertently hear Hofmann and Clifford Jagodzinski, another Branch Risk Officer, discussing their concern as to why the auditors were investigating the branch for such an extended period of time and requesting very specific information. They

13

also learned that the FINRA auditors had requested a copy of all compliance approved cold calling scripts.

K.  **Boland's Complaints to Gorman are dismissed without proper investigation by MSSB**

62.  On August 10, 2011, Katz wrote to Boland and informed him that the Regional Risk Officer, Jean DePinto concluded her investigation of "supervisory concerns" and specifically "Interns entering orders, client complaints…, sharing passwords, FA's logging their interns on (to trade)… we have been unable to substantiate them." Notably DePinto involved Turetzky in the investigative process.

63.  This was a complete shock to Boland for at no point did DePinto ever contact Boland or Feldman by telephone, personal meeting or email to discuss the alleagtions Boland outlined in his email to Gorman or in his discussions with Katz nor did anyone from Morgan Stanley ever request a copy of the evidence that had in their possesion.

64.  In August, at the height of FINRA Audit, Feldman was observed documenting one or more instances of regulatory violations, as she had been requested to do by the FINRA investigators. This was later categorized as Feldman "spying" on her coworkers.

L.  **Feldman is terminated for "Performance" in spite of a pending $50,000 commission, and opening a $1,800,000 account**

65.  In early August, with the knowledge and consent of MSSB compliance, Feldman and Boland entered into a new JPA and were subsequently assigned a joint production number.

66.  In spite of the distractions of the audit, Feldman and Boland continued to work to build their business. On August 23, 2011 a new account was opened for $1.8 million and credited to Feldman and Boland's joint production number. In addition, the client's mortgage transaction and insurance policy purchase was about to generate $50,000 commission.

67. On August 24, 2011, Hoffman sent an email to the branch apologizing for another FINRA questionnaire that had to be completed. Feldman had just printed Hoffman's email when she was asked to come to Turetzky's office. Feldman had expected to be congratulated for opening a large account the day before. Instead she was informed by Turetzky (with Gallagher present) that she was being terminated for "Performance".

68. Gallagher immediately escorted Feldman from the building after confiscating her security pass. It was apparent that after Feldman had been reported to Turetzky for "spying" on her co-workers, Turetzky had concluded that Feldman had reported her concerns directly to the regulators.

69. The allegations of poor performance were pretextual. Defendants had already offered to transfer Feldman to a new office. She had terminated her JPA with Silverstein and was taking concrete steps to grow her business. She had just landed a $1.8 million account. It was after the firm discovered that Feldman had been talking to the regulators that Turetzky finally got his way and Feldman was terminated.

**M.   Defendants Retaliate Against Boland**

70. After Feldman's termination, Turetzky dissolved Feldman and Boland's JPA and assigned virtually all of the assets to a single broker, Loccisano. Upon information and belief, Turetsky reassigned the assets in violation of firm policy which requires approval from higher management and assignment of accounts through MSSB's computer system.

71. The assignment to Loccisano who had absolutely no relationship with the clients, as opposed to Boland who was well known to them and familiar with their investing needs, was not in the best interests of the clients. Moreover Loccisano was disinterested in managing these clients and delegated client meetings and investment advice to his sales assistant, itself a violation of MSSB policy and regulatory requirements.

15

72. As a gesture of good faith Boland approached Loccisano to assist with the transition. Loccisano refused to speak with Boland. Gallagher thereafter barred Boland from speaking with Loccisano, even though Loccisano was the head of MSSB's mandated weekly training program and was supposed to provide needed guidance.

73. Despite the shock of his wife being terminated without grounds, Boland continued to gather client assets and develop business. Even with having been stripped of over $6 million in assets, and the associated revenue, Boland had exceeded his six month asset target in three months of production.

74. On or about the first week of September, Boland formally informed Hoffman and Jagodzinski, the MSSB risk officers, that he and Feldman had attended a meeting with the regulators in early August to report activity he believed violated SEC and FINRA regulations.

75. Thereafter, Boland updated Gallagher on his pipeline of opportunities to gather new assets to the Firm. Boland requested to be assigned to an established team but Gallagher refused and told him that he had to work with Santo and two other brokers, an arrangement which Boland had previously rejected in part because of the brokers' negative disclosures on BrokerCheck.

76. Turetzky never allowed Boland to pair up with a qualified senior financial advisor and to his knowledge, he was the only trainee not to receive this mentoring and assistance from MSSB. Turetzky's refusal to allow Boland another mentor, his prohibition of Boland speaking with Loccisano and his refusal to allow Boland to keep the clients he had developed with Feldman were just some of the ways in which Turetzky marginalized Boland and impeded his success.

77. In spite of the hurdles Turetzky placed in front of Boland, Boland diligently continued to uncover new opportunities and make meetings with high net worth clients.

78. Specifically Boland wrote to Gallagher to update the mortgage/insurance transaction that had been in the works prior to Feldman's termination. Had those transactions closed while Boland was employed, they would have generated revenue that would have propelled Boland to the highest performance level for trainees.

N. **Boland is Terminated While Caring for His Ailing Wife**

79. In October 2011, Feldman was diagnosed with Post Traumatic Stress Disorder. Feldman was also diagnosed with abnormal cells after a biopsy on her thyroid. Feldman was immediately scheduled to undergo a thyroidectomy at Memorial Sloan Kettering Cancer Center.

80. In early November, 2011 Boland requested medical leave to assist his wife's preparation for her surgery. Feldman's therapist had recommended that she have a few weeks away from New York City in preparation for the operation.

81. Boland requested medical leave directly from MSSB Human Resources. When Human Resources questioned why Boland was not requesting this leave from his manager, Turetzky, Boland responded that Turetzky was attempting to terminate him because he was a whistleblower, and Boland believed that if he requested leave for any reason, even medical, Turetzky would seize upon the opportunity to terminate him.

82. In an email on November 3, 2011 Turetzky approved two weeks of medical leave.

83. On November 30, 2011, less than 48 hours back from approved medical leave and with two large opportunities about to close, Boland was called into Turetzky's office where Turetzky and Gallagher were present and informed that he was being terminated for "Performance". The termination occurred just before Boland's one year anniversary in order to deprive him of coverage under the Family Medical Leave Act.

84. The performance issues were pretextual. Turetzky terminated Boland because of his support of Feldman raising issues of fraud and Turetzky's failure to supervise brokers, for

raising regulatory and compliance issues with Gorman and Katz, for meeting with FINRA investigators at their offices in early August 2011 and further cooperating in the FINRA investigation of the branch.

85. Within hours of his termination, Boland wrote Gorman to complain of the retaliatory treatment. Gorman received the email but never responded, giving lie to his prior assurance that Boland's concerns would be handled.

O.  **Feldman and Boland File Claims With OSHA**

86. In February 2012 Feldman timely filed a Complaint before Occupational Safety and Health Administration ("OSHA") against Morgan Stanley and MSSB pursuant to the pursuant to the Sarbanes-Oxley Act. In May 2012, Boland filed a similar complaint.

87. The matter was assigned to an OSHA investigator who conducted a preliminary investigation. OSHA had not made any findings nor rendered a final decision when, on August 21, 2015, counsel for Feldman and Boland informed OSHA that they intended to exercise their right to file a claim in federal court.

### AS AND FOR A FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
(Violation of the Sarbanes Oxley Act)

88. Plaintiffs repeats and realleges paragraphs 1 through 87 as if fully set forth herein.

89. By their actions set forth above defendants violated Title VIII of the Sarbanes Oxley Act, 18 U.S.C. § 1514A which provides, "an employer may not discriminate against any employee in the terms and conditions of employment because of any lawful act done by the employee to provide information to the employer, a federal agency or Congress concerning violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), or 1348 (securities fraud), or any other federal law relating to fraud against shareholders."

90. Turetzky was an officer and agent of Morgan Stanley and MSSB and the direct

supervisor of the plaintiffs. As set forth above, he actively participated in the adverse employment actions taken against Plaintiffs in retaliation for their whistleblowing activities and is therefore individually liable for the wrongful conduct alleged herein.

91. As a result of the foregoing, Plaintiffs have suffered damages including statutory damages, back pay with interest, and compensation for any special damages sustained as a result of the retaliation, including lost wages, litigation costs, reasonable attorney's fees and damages for emotional distress.

## AS AND FOR A SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
### (Violations of the Dodd Frank Act)

92. Plaintiffs repeats and realleges paragraphs 1 through 91 as if fully set forth herein.

93. By their actions set forth above defendants have violated Section 922 of the Dodd-Frank Act which provides in relevant part that "No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, [a] whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower (i) in providing information to the Commission in accordance with this section or…. (iii) in making disclosures that are required or protected under the Sarbanes Oxley Act of 2002."

94. Turetzky was an officer and agent of Morgan Stanley and MSSB and the direct supervisor of the Plaintiffs. As set forth above, he actively participated in the adverse employment actions taken against Plaintiffs in retaliation for their whistleblowing activities and is therefore individually liable for the wrongful conduct alleged herein.

95. As a result of the foregoing, Plaintiffs have suffered damages including statutory damages, back pay with interest, and compensation for any special damages sustained as a result of the retaliation, including lost wages, litigation costs, reasonable attorney's fees and

damages for emotional distress.

WHEREFORE, Plaintiffs demands judgment against defendants as follows;

(1) On the First Cause of Action, awarding damages in an amount to be proven at trial but in excess of $10,000,000.

(2) On the Second Cause of Action, awarding damages in an amount to be proven at trial but in excess of $10,000,000.

(3) Awarding the costs and disbursements of this action, including reasonable attorney's fees

(4) For such other further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a trial by jury.

Dated: New York, New York
August 23, 2015

REAVIS PARENT LEHRER LLP

By: _____
Alice K. Jump (AJ 9314)
ajump@rpl-law.com
41 Madison Avenue, 41st Floor
New York, NY 10010
Tel: (212) 763-4100
Fax: (212) 763-4141